STATE OF MISSOURI, Respondent, v. EMMA KEITHLEY, Appellant.

**Springfield Court of Appeals, April 4, 1910.**

1. **CRIMINAL LAW: Husband and Wife: Unlawful Use of House: Presumption.** When husband and wife live together, he is presumed to be the head of the family and, regardless of ownership, he is presumed to be liable for an unlawful use of the house; and, to render the wife liable, it must appear that she was active in giving such permission, and in failing to prevent such use. Evidence in this case examined and held sufficient to show that the wife actively participated in keeping a bawdy house.

2. ————: **Misdemeanor: Keeping Bawdy House: Husband and Wife: Instructions: Duty to Request.** In the trial of a married woman on the charge of keeping a bawdy house, it is not error to fail to instruct the jury on the theory that the defendant, being a married woman, was presumed to be acting under the influence or coercion of her husband, in the absence of a request for such an instruction on the part of the defendant.

3. ————: ————: ————: ————: ————. If defendant, charged with keeping a bawdy house, desired a special instruction defining a bawdy house keeper, or setting out what facts were to be considered in determining who was the keeper, a request should have been made therefor.

4. ————: **Distinction Between Bawdy House and House of Assignation: Instruction: Duty to Request.** Under the statutes and dictionary definitions, it appears that bawdy house and house of assignation are used synonymously, but where the defendant was tried for keeping a bawdy house, and the court properly defined that kind of a house and limited the instructions to the same, and defendant failed to request additional instructions covering any claimed distinction between the two, she is in no position to complain.

Appeal from Phelps Circuit Court.—*Hon. L. B. Woodside,* Judge.

AFFIRMED.

142 App—27

*J. J. Crites* and *A. Corse* for appellant.

*S. N. Lorts* for respondent.

(1) If the instructions given by the court are not broad enough to cover the issues as presented by the evidence, defendant should call the court's attention to that fact before the case is submitted to the jury, and should ask further instructions. State v. Price, 186 Mo. 144. (2) If the court failed to instruct the jury upon all questions of law arising in the case which were necessary for the information of the jury in giving their verdict, exceptions should have been saved at the time such failure occurred, and the point should have been presented in the motion for a new trial. State v. Cantlin, 118 Mo. 111; State v. Albright, 144 Mo. 638; State v. DeMosse, 98 Mo. 343; State v. Elvins, 101 Mo. 243; State v. Foster, 115 Mo. 448; State v. Frisley, 193 Mo. 211; State v. Groves, 194 Mo. 452; State v. McCarver, 194 Mo. 717; State v. Bond, 191 Mo. 555; State v. Sublett, 191 Mo. 163; State v. Urspruch, 191 Mo. 43; State v. Welch, 191 Mo. 179; State v. Gordon, 196 Mo. 185. (3) The evidence, when taken in the whole, is sufficient to make out a strong case for the State, and the demurrer to the evidence offered by defendant was properly overruled. State v. Price, 115 Mo. App. 656; State v. Horn, 83 Mo. App. 47; Kelley's Crim. Law (2 Ed.), secs. 956, 662; State v. Clementine, 14 Mo. 114; State v. Dudley, 56 Mo. App. 450; 9 A. and E. Enc. Law (2 Ed.), 533; State v. Bean, 21 Mo. 267.

GRAY, J.—The appellant was convicted of keeping a bawdy house on an information filed by the prosecuting attorney of Phelps county, charging her with said offense. Failing to obtain a new trial, she appealed to the St. Louis Court of Appeals and the cause is here on a transfer by that court.

Complaint is made that the evidence was insufficient to show (1) that the house described in the evidence was a bawdy house; (2) that the defendant was the keeper thereof. The testimony shows that the defendant lived with her husband and two daughters, in a house in the city of Rolla, and in that part of town known as The Chute. As the defendant challenges the sufficiency of the evidence to prove in fact that the house complained of was a bawdy house, it is proper to set forth some of the evidence relating thereto. William McDowell, witness in behalf of the State, testified as follows:

"Q. I will ask if you know anything about the matter of her (the defendant's) associates; these men and women that go there frequently to her house? A. I do.

"Q. Who have you seen there? A. I have seen Lucy Capps there.

"Q. What is her reputation here in Rolla for being a lewd and lascivious woman? A. Bad.

"Q. Who else did you see there? A. The Shanks girls.

"Q. What is their reputation? A. Bad.

"Q. Who else did you see there? A. Ida Dodson.

"Q. What is her reputation? A. Bad.

"Q. Who else? A. Sarah Wilson.

"Q. What is her reputation? A. Bad.

"Q. Who else did you see there? A. Jack Kyler, Jack Gilmore, Sig Riley, Mr. Vanderpool."

The witness also testified that one night when the defendant's husband was drunk and had been knocked in the head, he was there waiting on him, and that during the night he had occasion to go into another room, and he found the defendant lying on a pallet with one Sig Riley, and that the room was dark.

Several other witnesses testified that the reputation of the defendant as being a lewd and lascivious

woman was bad. There was testimony that other women than those above mentioned, were seen at the house of the defendant. A Mrs. Stafford was called as a witness in behalf of the State, and she testified as follows:

"Q. Who told you that the house had a bad name? A. I don't see what else it would be.

"Q. Who told you? A. Well, I guess a person can see for their own self of the people that were going there.

"Q. You speak of your own knowledge? A. I speak of my own knowledge. I would not think that such a class of people that would go there and blackguard—if I were keeping them at my house it would not be a very good house."

Samuel Barnwall, a witness for the State, testified that he had been at the defendant's house frequently, and that he sustained criminal relations with her many times, and frequently gave her money; that while he was there he had seen other men and women at the place, and that the reputation of the women was that of prostitutes. We think the testimony abundant to establish the fact that the house was a common bawdy house, within the meaning of our law.

It is next claimed that the defendant was not shown to be the keeper thereof, and for that reason, the court should have directed the jury to find a verdict of not guilty. The appellant during the period laid in the information, was living with her husband at the place in question. The court instructed the jury that if they found and believed from the evidence, that within one year prior to the filing of the information, the defendant, in Phelps county, Missouri, did set up and keep a bawdy house, to find her guilty. Also that a bawdy house as used in the instructions, is a house kept for the purpose of prostitution, that is, for men and women to have unlawful, illicit, sexual intercourse together therein. In addition to the above the court gave the defendant instructions on the pre-

sumption of innocence and reasonable doubt. A husband and wife may be jointly indicted and tried for keeping a bawdy house. [State v. Bentz, 11 Mo. 27.]

If the defendant desired an instruction submitting specifically to the jury the theory that the defendant, being a married woman, was acting under the influence or coercion of her husband, the same should have been asked. The testimony in behalf of the state is ample to show that the defendant was active in giving permission, and in no wise was passive in failing to prevent the illegal conduct at her house. The rule is correctly stated in McLain on Criminal Law, sec. 148, as follows: "When husband and wife live together, he is presumed to be the head of the family, and regardless of ownership, he is presumed to be liable² for an unlawful use of the house, and to render her liable, it must appear that she was active in giving such permission, and in failing to prevent such use."

The testimony above quoted showing that the wife was receiving money for improper relations with the witness at her home, and that when her husband was drunk and injured from a blow on the head so that he was seriously injured and in no condition to manage or be responsible for the affairs of the household, the defendant was lying with a man in a compromising position at night in an unlighted room in the house, and the further fact that a number of witnesses testified that her reputation as a lewd woman was bad, was ample from which the jury could find that she, as well as her husband, was the keeper of the house.

In People v. Wheeler, decided in 1905, by the Supreme Court of Michigan, and reported in 105 N. W. 607, the defendant was a married woman, as here, and living with her husband. The defendant asked an instruction, to the effect that the law presumed that whatever the wife did in the way of keeping the house of ill fame, was done under the coercion of her husband until the contrary had been made to appear be-

yond a reasonable doubt. The court refused this instruction, but gave general instructions, as was done by the trial court in this case. The court affirmed the action of the trial court and said: "It was not error to decline to give the jury the instruction offered on the part of the respondent. There is no presumption that the wife was coerced. The testimony does not even suggest that there was coercion in fact."

The failure of the court to give an instruction on the question as to whether the defendant was the keeper of the house, to take into consideration the fact that she was a married woman, living with her husband, was not error, because no request therefor was made. [State v. Mathes, 49 Mo. App. 237; State v. Baldwin, 56 Mo. App. 423.]

What we have just said in relation to the failure of the court to give an instruction on the relation sustained by the defendant and her husband, is equally applicable to the complaint that the court did not define the keeper of a bawdy house. The court properly defined a bawdy house, and if the defendant wanted a special instruction as to what facts were to be considered in determining who was the keeper, request should have been made therefor.

Appellant's last assignment of error is the following: "The court erred in submitting to the jury the evidence offered by the state as to the keeping of an assignation house after sustaining a demurrer to exclude that testimony." The information charges "unlawful setting up, keeping and maintaining a bawdy and assignation house, commonly called a house of ill fame, by then and there keeping and suffering to remain therein for the purpose of prostitution and lewdness, lewd men and women, and by then and there permitting and suffering diverse other lewd and dissolute men and women to resort to said house and come together therein for the purpose of illicit sexual intercourse, against the peace and dignity of the State."

It will be seen that the information does not attempt to charge but one offense, and that is "keeping a bawdy and assignation house, commonly called a house of ill fame." Our statute uses the words "bawdy house or brothel, or house of assignation." In State v. Horn, 83 Mo. App. 1. c. 50, the court instructed the jury that a bawdy house or brothel is a house of ill fame, kept for the resort and commerce of lewd people of both sexes. This definition also applies to an assignation house. Webster defines a bawdy house to be a house of ill fame. The same definition is given by Anderson in his Law Dictionary; also by McLain on Criminal Law, 2 vol., sec. 1138. In McAllester v. Clerk, 33 Conn. 91, the court defines an assignation house as follows: "An assignation house is a house resorted to for the purpose of prostitution and is synonymous with bawdy house or brothel."

Whether we agree that bawdy house and assignation house are synonymous or not, it is apparent in this case that the defendant was tried for keeping a bawdy house, and the court properly defined that kind of a house and limited the instructions to the same. If the defendant desired any additional instructions concerning the same, request should have been properly made therefor.

We have reviewed the points urged for reversal, and having determined the same against the appellant, and being of the opinion that the defendant had a fair trial and was properly convicted, the judgment of the trial court will be affirmed. All concur.